Corporation v. Iancu. Good morning again. May it please the court. This case is dealing with the 643 patent. We just got finished talking about the 676 patent, but the issues here are very similar in that the petition failed to present the required algorithmic structure of a computer implemented means-plus-function claim or any structural equivalency analysis. In the case of this patent, the board went as far as to reformulate the petition grounds at institution to imagine new grounds. The new grounds were nowhere proposed in the petition. This was done despite this court's prohibition of the and the Supreme Court in SAS from the PTAC. They adopted your own construction. What I'm talking about is the petition grounds, Your Honor. So what they said is If they adopted your own construction, you must have had notice of that. There's no issue that we had notice of around construction, Your Honor. That's not the issue. What we're talking about here is the trial grounds. When you come in and say the control means, or excuse me, the reproducing means requires a controller and a synthesizer. Sorry, I'm missing my case. You're in the wrong case. Right, so this was the case where they came in and they said the control means requires a CPU. And here's the CPU in the prior art. That was the petition. That's what the board considered. Is your position that if we thought that it were properly instituted, or at least that that's not No, we are contesting the merits of the decision as well, Your Honor. That would be helpful to hear, your view on the merits. So ultimately what happened here is at institution, the board stated that, well, we understand this prior art mapping, which was only pointing to a CPU, as actually pointing to structure. Even though the petitioner never pointed to such structure, even agreed that it is necessary. So when we're disputing the actual ground, what we said is, well, there's no analogy. What the board said, and so this is at the institution decision JA-177, they said, okay, we've seen the preliminary response come in from Sony. We've seen that they've argued that the algorithm is column 7, lines 58, through column 8, lines 10, and figure 8. We agree with that. That's the algorithm. That's the proper construction. And from there, they worked backwards through the petition sites to say, well, the petitioner must have meant this, and they must have been pointing to this for this algorithm. But they never did any of that. They never explained in the petition, well, what is it that makes the algorithm in these references equivalent to the algorithm in the specification? So the board said, well, if you look at this algorithm, it's judging, it's selecting, and then at the end, they said, and there's a step S-17 that has to do with tuning, and we understand all of that to be in the petition. They didn't say where any of this was. So Sony was left trying to figure out what this ground actually was, and then at the end of the trial, the board allowed the petitioner to come in, and what the petitioner said is, well, I'm going to put my ground in the terms of the board. So this is what the board said the ground should be. So now in my reply, I'm going to provide a new claim chart where now I'm talking about algorithms for the first time. Now I'm talking about figure eight for the first time, and we objected to that. We argued that it was improper. But when the board found that the algorithm was disclosed in the prior art, they used the same definition of the patent owner response, correct? Well, not exactly. Going back to that institution, the JA-177, on the one hand, they say, yes, Sony argues that column 7, lines 58 through column 8, lines 10 is the algorithm, and it's in figure 8, and then underneath, and they sort of characterized what that algorithm would be, but they simplified it. They said, well, it's judging, it's selecting, and they then pointed to the mapping of the prior art that related to the operation. What's the mistake? I mean, it seems to me that if they took your construction of what the algorithm was, and then they applied that to the prior art, which I think they did, then you don't have any complaint about what happened here. You seem to be arguing that they misconstrued the algorithm or then you had proposed that it be construed, and what I'm trying to get at is what's the difference? Thank you, Your Honor. I appreciate the clarification. So what we said and what we argued in the rehearing decision, so after the institution where they adopted or said that they adopted our claim construction, what we said is what is claimed is a CPU algorithm. What the board pointed to in the prior art is the user experience. In other words, I'm holding down the remote control button, I lift my finger off, what happens on the remote control? Nowhere was there any discussion of how the CPU in the prior art operates. In other words, how is this processing done? How is the tuning done? Where's the MPEG tuning? Where is the steps in figure 8, S11 through S17? They talk about S11, they talk about S17 at institution, but they don't identify where any of that was in the prior art. So what we've said is, look, the claim is But if the user does these, you know, it's presented with these choices, doesn't that necessarily mean that it's part of the software? Well, there's an analogous function there for sure in that the remote control operation worked the same way, but how the CPU implements that, that's where the structural equivalency occurs. I mean, I don't see that the claim requires that the CPU implemented in a performs the algorithm. Well, but the algorithm is not the function of the, you know, sensing just the button pushing and displaying on the television. The algorithm is how the control means controls the tuner to do all of these things. That's what's in figure 8 and that's the algorithm that was adopted by the PTAP. This wasn't, you know, it's not just, well, the function is detecting when the finger press is broken and operating. That's the function. How that's done, how that's accomplished in the CPU code is what's in that portion of the specification is what's in figure 8. And so what the board said at institution is, well, we see this in the prior art and what we said at rehearing as well, but what you're pointing to is not a CPU algorithm. You're pointing to a common functionality. Yes, the remote control may operate the same way, but how does the perform that processing? That's what's important. So we got all the way through trial and then the petitioner tried to adapt their grounds to the board's, essentially, the board's view of the grounds, provided a new claim chart. But even still there, it was just pointing to the user experience. It wasn't explaining how the CPU was looking up in the steps of figure 8. I think S12 through S14 talks about certain incremental ways that the tuning is done, and then step S17 talks about how the MPEG processing is done. None of that ever came up, ever, was explained anywhere. The whole discussion of S17 was raised for the first time by petitioner at the oral hearing because it occurred to them that at this JA-177, which is the institution decision, oh, the board listed S17 as part of the algorithm. There's really no discussion of that in the record. They tried to bring it in an oral argument. They put up a demonstrative. They circled in red S17. That was nowhere in the briefing. We can't address that unless we're presented with it. And then on appeal, the solicitor says, well, you know, you could discern where the board was going on that because MPEG is discussed in other contexts, in other areas, for different claim terms. As patent owner, we can't be left guessing as to what the ground is, especially at institution where the board simply excused a fatal error and rewrote the trial grounds. We have that up front. That's the petitioner's burden. It wasn't here. We can't just look at this algorithm and say, well, it's simple, therefore, we don't have to analyze it. And that is what happened. So, you know, just finishing up, I'll reserve the rest of my time for rebuttal, but, you know, the PTAT cannot rewrite the trial grounds to cover structure that the petitioner affirmatively pointed out in the petition wasn't there. They said this is CPU, period. The PTAT cannot allow the petitioner to recast his petition grounds at the close of trial. It denied us the opportunity to submit evidence on these points when the petitioner was allowed to, as it states, write its ground in the terms of the board. And the PTAT cannot sidestep these specific steps of the algorithm by characterizing it as just judging and selecting. And even if all of that could be ignored, which I submit it cannot, step 17 is part of the algorithm adopted by the PTAT. It's nowhere discussed in the record, and like I say, it came up for the first time at oral hearing, and there is no explanation in the solicitor's brief for fixing that hole because you just can't fix that hole in the trial ground by creatively pointing to different pieces of court. The substance of both the claim construction of the algorithm and how the prior art meets it were all in the initial petition. The form might have been, the form didn't call those things an algorithm. They didn't say the words this is the algorithm, but what an algorithm is, is just a series of steps. And the petition laid out that series of steps in the exact section of the claim construction part of the petition dealing with this particular limitation, and then it also went through the prior art in the exact section of the petition dealing with this limitation. Stepping back for a minute, the algorithm here is a very simple one. It is controlling the, it's a control function, so it's controlling the components described in the other limitations so that they only receive the TV signal when the user's finger is lifted from the up-down button. So that's a very simple yes-no algorithm telling these things to function or not function when the user's finger is lifted. These, both of the petition explained, if you look at, I think it's useful to look at the actual if the user instruction tells the user to perform the particular steps, that means that those steps are part of the algorithm in the processor. I think it went, I think the petition and the board has it both ways. No, but wait, try to answer my question, okay? What I'm saying is that if the user is instructed to perform particular steps, that that, in terms of the processor having the algorithm. Oh, so this is sort of the pushing of buttons. Yes, it, the claim itself is defined in terms of the, yes, yes, the answer is yes. Okay. The answer is yes. So yes, Your Honor, and then, and that makes sense because the claim itself is defined in terms of the user pushing the buttons. Like, going to the claim language itself, this claim has a series of limitations. Most of them were control means limitation. So the claim language itself talks about users pushing buttons. So that's how the claim defines what the, what the algorithm is. So, for example, the claim, this, this limitation is, incorporates a bunch of other limitations, right? It's the controlling for these other limitations. So it controls the transmission, transmission signal receiving means. So that's the limitation 1A, that first limitation, to receive a channel, which is what that limitation does, indicated by the channel number being displayed, which is also, in other limitations, 1E and 1C. So it's all just controlling these things that exist otherwise, to, to display that channel when the command received by the command receiving means is broken. So what's the command receiving means? That is also another limitation, which is limitation 1B, which is for receiving a command from a channel selection key operated by a user. So a channel selection key operated by user, that's a user pushing the key. So that is the way the claim is defined expressly. Also, the same thing in, in 1E, this is that one of the other limitations that's also referenced in, by this claim, which is another part of the, the, the invention, which is that the, the numbers of the channel are only displayed as changing and not the channel itself, that's in limitation 1E. So, and that says, until the operation of the channel selection key is discontinued by the user. So that's when the user takes the finger off. So the, the, by defining it in that way, we're looking at the, the users taking off the finger, that getting sent to the, the command receiving means, which this limitation references. Then because that is sent to the command receiving means, we know that from that limitation, the command receiving means knows, okay, I'm going to change the channel. And it talks to the other means about doing that. So the, the action of lifting the finger up and off is already described in all the other means on how that works with the, the, the system to tell the system, okay, if it's, if it's if the finger is on, then keep going. And if the finger is off, receive the channel. Looking at the, I mean, I think that there are, my friend here mentioned some of the other steps, and I think it's worth looking at figure eight, and also at the board's decision. So the key, the, the function here, really the function here is just controlling everything, all these other limitations, so that they only work when the command is discontinued. And then figure eight is what my friend referred to, and that corresponds to the portions of the specification that both the petitioner cited and the board cited in the petition, in the institution decision, in the reply, in the final decision, in the, the, in the demonstratives. So these were the same provisions that are, that, that were throughout the, the IPR. And if you look at what's going on, the key step is S16, which is channel key input finished. So that means, are you done, is the input done, are you done pushing the button? And if it says no, if it's, if it's no, then you go back to just tell, is the channel key still being pushed? And if, if it's, if it is finished, then you go to the channel selection processing, which is step S17, to tell the transmission signal receiving means to go ahead and do its thing, and receive that channel. The way that the, I think both the petition and the board view the main algorithm as just this yes-no function. So it's really, and not incorporating then the next steps of actually receiving, or the next steps of, of searching for the channel without, and just displaying it without receiving it. But both the petition and the board covered those steps as well, because what's really going on here is both Rosenberger and Ajima teach the simple algorithm in an analog system. Because the same problem existed in analog TVs, that if you held the button to try to go up, there was a delay. So that would take a long time to scroll through channels. So they had the same problem in analog systems. It was not as much of a delay as in a digital system, because you don't have to wait for every, all the So that algorithm itself is present in each of Rosenberger and of Ajima. If, if we want to view it, but both the petition and the board covered the basis that if you want to view it more broadly, as actually including those steps, and doing not just going to S17 and saying, do your thing, but also including all the prior art. And you get that from Wasilewski, because Wasilewski is an MPEG digital decoder. And these steps of, of receiving the channel, MPEG is a standard. Any decoder that would receive these MPEG streams would include decoding and using the, the channel tables, including this conditional access table to be able to, to be able to actually receive the program. Otherwise, the MPEG decoder wouldn't work. So Wasilewski, there could be many MPEG decoders that could be used, but Wasilewski is the one that was cited. And Wasilewski teaches all those steps of decoding the MPEG and also confirming the conditional access channel. And we see that in the petition at, for example, at Appendix 86, where, in Appendix 85, where it states, the CPU controls the tuner, the demodulation circuit, the error correction circuit, and the like. And after the infrared signal is received by the infrared signal receiving unit, the CPU controls the tuner to receive the channels corresponding to the inputted channel number. When receiving a signal supply corresponding to the infrared signal from the infrared signal receiving unit. To change the channel, the tuner demodulates a signal corresponding to a channel number instructed by the CPU to send out to the demodulation circuit. And that's also supported in their expert declaration by Dr. Russ at the portions that they cite, including specifically for the limitation at issue here, the control means limitation. There's also some general discussion in the declaration as well about MPEG and that Wasilewski is an MPEG decoder, that MPEG is a standard, that MPEG decoders decode MPEG streams. That's what they, that's just what they do. And also mentioning, for example, the different channels, excuse me, the different tables that are all transmitted as part of the MPEG stream, including the conditional access table. So there's three other tables that are also transmitted. So it discusses, Wasilewski discusses that in decoding the MPEG streams, it would decode them and also use the tables. The first time today, and I didn't see this in their briefs, but it's, we can address it. This is the first time that I've understood Sony to suggest that also the other steps on, of S12, S14, S15, S13 are included in the algorithm. I didn't see that anywhere, but I can, but the board covered them and that makes sense because they've covered them in both, both this limitation and other limitations. So that is the set of steps whereby the device searches for the, either the next channel up or the next channel down, and then only displays the channel number and doesn't display the show itself. And those steps are what correspond to limitation 1E, which is where the channel number being switched are displayed without displaying a channel selection until the operation of the channel selection key is discontinued by the user. So the board covered all that in 1E and they didn't have any objection to that for all these limitations were undisputed, but the board did also address S12 and 14 and 15 and S13 when it was discussing AGIMA and Rosenberger, because these are the parts of AGIMA and Rosenberger that just say what this is doing is just that the that the channels are changed up or down while only the number is being displayed. So that's that set of limitations, and the board, those were in the petition as well in the petition discussion, and they were also in the board's decision. I personally didn't see that in any of the briefing even here, let alone below. I did see the S17 in the, at the oral argument below, which is where, well, S17 was always part of the claim construction. The question is just whether you view the algorithm as go and perform these steps. So go to S17 and then tell the decoder to do this function, or whether you view it as then the decoder does all these things. But either way it's in the record, either way it's in the in the petition citations, the expert citations, and in the in the board's decision. I don't, when we, there was discussion about equivalence, I don't understand that exactly because the board has said it's indistinguishable. The algorithm itself is indistinguishable from the Rosenberger algorithm and the Ajima algorithm. But if we wanted to, but the board did use some equivalence analysis, indistinguishable is one of the factors of equivalence, but you don't need to reach equivalence if the algorithm is the same. And we cited that the transcript, for example, from the from the board hearing where the Judge Bisk said the algorithm is the same here, why do we need to get to equivalence? So that is, but either way, the board's found the algorithm is disclosed, it's these three steps, they're there, so there's no need to get to any equivalence analysis. But that whole analysis also would support equivalence as well. Unless the board has, I mean, excuse me, unless the court has any questions. I've talked about the board so much. Unless the court has any questions, I think we would rest on our and the description of figure 8 in the columns that I cited earlier, that includes the entirety of figure 8. What I heard here today is that the key step is S16. Well, the board never said that. What the board said is they adopted the algorithm described at those columns at which describes figure 8. The description of figure 8 is a flowchart for explaining a processing to select a algorithm. So there's a lot of discussion about step S16. Well, what about the other steps? If you want to say that they're so simple we can ignore them, then you need to say that. Then you need to make that showing because that's what we have to rebut, especially when none of this was in the petition and this is a creation of the board. There's also a lot of discussion about MPEG processing. It's not in the record. There's a discussion of this, some of the algorithm for MPEG processing if you're using teachings from analog references. We couldn't make that rebuttal because none of this MPEG discussion is in the record. The board said that this was the algorithm in figure 8 and they cited to the column that describes the entirety of figure 8. You can't just dismiss it and say it's simple. The board did at oral arguments say that they're the same and that's because they confused function and algorithm. The function of the way it operates with the remote control we will concede is the same. The CPU algorithm, which is in figure 8, is nowhere compared to any algorithm in the prior art and for that reason this IPR should be reversed. Thank you.